In the Matter of Abatement of additional assessments of STATE INCOME TAX assessed against the KANSAS CITY STAR COMPANY for the calendar years 1934, 1935 and 1936.—142 S. W. (2d) 1029.

Court en Banc, September 3, 1940.

(658)

*Roy McKittrick*, Attorney General, and *Russell C. Stone*, Assistant Attorney General, for appellants.

*Watson, Ess, Groner, Barnett & Whittaker* for respondent; *Henry N. Ess* and *John R. Moberly* of counsel.

ELLISON, J.—Action under Section 10135, Revised Statutes 1929, (Mo. Stat. Ann., p. 8107), by respondent, The Kansas City Star Company, a Missouri corporation with its chief office in Kansas City, Missouri, to abate additional assessments of State income tax for the years 1934, 1935 and 1936. The County Court of Jackson County denied relief, but on respondent's appeal to the circuit court the assessments were abated. From that judgment the County Assessor and State Auditor prosecute this appeal.

The respondent is engaged in the business of printing, publishing and circulating four widely read newspapers with an aggregate circulation of about 1,400,000, and also owns and operates a radio broadcasting station. Under the law from 1917 until 1927 state income tax was levied on the entire net income of the taxpayer. Recognizing this method discriminated against resident taxpayers who received income from business outside of this State, in favor of nonresidents receiving income partially from business within the State, the Legis-

lature changed the statute by Sec. 13106, Laws Mo. 1927, pp. 475, 476, to provide that every taxpayer, resident and non-resident, should pay the tax upon his entire net income from all sources within this State, "including a reasonable proportion apportioned to this state of net income derived from business partially within and partially without the state which cannot be definitely allocated." From that time on respondent paid State income tax at least for ten years, from 1927 to 1937, by allocating to Missouri such proportion of its total net income as represented the percentage of its newspaper circulation in this State. Verified returns were filed during these years showing said percentages. They did not expressly disclose on their face that the percentages were based on circulation, but appellants understood that fact, as will appear from what follows.

Until the fall of 1937 these returns were never challenged, except that in 1928 the State Auditor rejected the first one on the theory that the new law permitting allocation did not cover the whole calendar year 1927, because it did not go into effect until July of that year. This return was corrected and accepted. Again, the percentage figure used by respondent in 1932 was questioned, but nothing was ever done about it. However, in October, 1937, the County Assessor made an additional assessment against respondent for the years 1934, 1935 and 1936 (as authorized by Sec. 10132, R. S. 1929, Mo. Stat. Ann., p. 8106). These additional assessments are the ones at issue in this case, and simply added taxes for the part of each year's income that the returns had excluded by allocating it to outside circulation. None of the figures are disputed. In detail they were as follows:

| | % of circulation in Mo. | Same outside of Mo. | Total net income | Income allocated to circulation in Mo. | Tax paid | Income allocated to outside circulation | Disputed additional tax assessments thereon |
|---|---|---|---|---|---|---|---|
| 1934 | 62% | 38% | $1,359,303.98 | $842,768.48 | $16,235.37 | $516,535.51 | $11,058.77 |
| 1935 | 62.25% | 37.75% | 1,424,077.04 | 886,487.96 | 17,449.62 | 537,589.08 | 10,751.78 |
| 1936 | 62.9% | 37.1% | 1,584,702.12 | 996,777.63 | 19,935.39 | 587,924.49 | 11,758.49 |

Total.................$35,569.04

Appellant's several assignments of error converge on two main points. The first is that the allocation of respondent's income on the basis of newspaper circulation inside and outside this State was improper, because respondent failed to make a request in writing and to obtain the State Auditor's permission thereto, under Sec. 10115, Laws Mo., 1931, p. 365. The second is that under the evidence all of respondent's income for the three years in question resulted from the conduct of its business at its principal office in Missouri, and was derived wholly from sources in this State. This second point is urged notwithstanding appellants assert at another place in their brief that questions as to the reasonableness of the method of allocation are purely administrative and reserved by statute for determination by the State Auditor, not this court. From this we conclude appellant's contention is that under the evidence

and upon a proper construction of the statutes there was no legal basis even for a discretionary approval by the Auditor of the method of allocation adopted by respondent.

Respondent's business involves the gathering, writing and transmission of news from points within and without Missouri to the principal office in Kansas City, where it is edited and printed in one or more of its four newspapers and the newspapers thence are promptly circulated to subscribers within and without the State. The advertising in these papers is similarly solicited, prepared, transmitted, printed and circulated. Radio programs and advertising also originate and are broadcast within and without the State.

The income from these enterprises is derived chiefly from advertising and newspaper sales. Radio listeners, of course, pay nothing. Advertising rates depend on the volume, quality and locale of circulation; circulation, on reader interest; and reader interest on the news, informational and entertainment value of the papers, including prompt and accurate circulation since, as one witness testified, news is the most perishable of all commodities. Much of the news and advertising locally circulated has been gathered abroad; and of that locally gathered much is circulated abroad. The income being derived from multiform and interdependent activities involved in the collection and dissemination of news and advertising within and without the State, there is no possibility of segregating it into parts attributable to domestic and foreign transactions.

The record does not show what percentage of newspaper space was devoted to outside news during the period here involved, but it appears that 95% of the Associated Press news was of that class, and inferentially the same was true of the International News Service and the New York Times-Chicago Tribune Service since these were duplicated services. Practically all the intake from the North American Newspaper Alliance was of foreign origin, and there were many staff and special writers sending in news from outside. We find no proof as to the relative amounts of state and national advertising in the newspapers during those years, but it is shown the part coming from the New York and Chicago areas, alone, brought in about one-fifth of respondent's entire gross income. About 70% of the radio programs on respondent's radio station W.D.A.F. came ready-made from the National Broadcasting Company. These and all others were broadcast over 51 counties in Missouri and 75 counties outside of Missouri.

The aggregate circulation of respondent's four newspapers, The Kansas City Times, published each morning except Sunday, The Kansas City Star, published each evening except Sunday, The Kansas City Star published Sunday, and The Weekly Kansas City Star, published once a week, was, as already shown, about 62% in Missouri and 38% outside during the years involved. There were three

major editions of the daily and Sunday papers, one for territorial Kansas, one for territorial Missouri, and a home edition for the Kansas City area. The Weekly Kansas City Star had three editions, one known as the Missouri edition, another for Kansas and the West, and a third for Arkansas and the Southwest. Some advertising was classified to go only in one or more of these various editions.

Now, as briefly as possible, concerning respondent's outside facilities for gathering news, radio programs and advertising, and circulating the same, and the location of these instrumentalities. Respondent had a complete office organization (except for printing) in Kansas City, Kansas, with managing or city editors and reporters who got up a great part of the Kansas edition of the daily papers. It had, also, news bureaus at Topeka and Olathe, Kansas. There were correspondents or space writers in many towns in Missouri, Kansas, Oklahoma and Nebraska. The great majority of these lived and worked outside of Missouri. The bureau at Washington, D. C., required the exclusive services of two trained correspondents who lived there. There were also correspondents in Jefferson City, New York, Chicago, Oklahoma City, Tulsa, Lincoln, Omaha, Wichita, Austin, Dallas, Des Moines, Reno, Winnepeg, Quebec, London, Shanghai and the City of Mexico. Space writers were retained in every city where the American Association had a baseball club, and the productions of numerous columnists and cartoonists regularly appeared in the papers. Editors, staff and special writers working on the papers at Kansas City made periodical trips throughout the county and even abroad to write interpretive and feature articles.

Respondent has two memberships in the Associated Press and takes it wire photo service. This is a non-profit, co-operative news gathering association composed of some 2,000 publishers and covering more than 3000 points throughout the world. Members act representatively for each other and the news produced by each must be made available to the Association. They may delete or condense news matter furnished by it but cannot change its substantial meaning. The Association also maintains a staff of writers who edit news furnished by members, and likewise write independently. Expenses are met by assessments against the members. Respondent's outlay on this one item was $145,000 per year. The North American Newspaper Alliance, to which respondent belongs, is similarly organized with a smaller membership of larger papers, and the news produced receives special treatment. In addition to these, respondent contracted for the International News Service and the New York Times-Chicago Tribune Service both of which are privately owned. The news furnished is purchased as a commodity.

To obtain advertising respondent maintained branch offices in New York and Chicago, each in charge of resident employees who devoted their full time to work over wide areas. There were eight of such non-

resident employees, and four who worked partly in Missouri and partly in other states. All or most of these were advertised solicitors and counselors, who not only advised prospective advertisers as to the drawing power of respondent's newspaper coverage, current economic conditions, consumer demands, etc., but also submitted advertising copy, pictorial matter and the like. Some advertising agencies would send in contracts to the home office in Kansas City. Newspaper distributors working in the circulation department also would solicit and accept advertising, especially classified advertising, want ads., etc. Rotogravure advertising was printed in Chicago. With reference to the radio, as already stated, about 70% of the programs were furnished by the National Broadcasting Company. The remaining radio time was occupied by broadcasts originating in the radio station. The New York and Chicago branch advertising offices and an advertising agency in Chicago handled most of respondent's national radio advertising.

On the circulation side of the newspaper enterprises. There were 572 carriers in Missouri and 814 in other states, who also solicited subscribers for all the papers. Those working outside Missouri lived outside. In addition there were seven employees who devoted all their time to soliciting subscriptions for the daily papers, about half in Missouri and half in Kansas. Forty-seven carriers who lived in Kansas City, Kansas, devoted all their time to delivering the daily and Sunday papers in that city. For other towns in Kansas within 100 miles of Kansas City a subscription quota of 95% of the families in each community was maintained, through the efforts of circulation and crew managers, who traveled also in Arkansas and Oklahoma. Delivery of the daily and Sunday papers was made by truck, bus, plane, U. S. Mail, railway baggage and express. They were transported to carriers in Kansas City, Kansas, in the respondent's own trucks. By truck elsewhere they were carried on a tonnage basis under contract. Outside of Kansas City, Missouri, and Kansas City, Kansas, the daily and Sunday papers were sold at wholesale to distributors, who were independent contractors, bound by contract to effect efficient and prompt delivery to subscribers. By this means doorstep delivery was made as far west as Salina, Kansas, and as far north as Falls City, Neb., and south as Chanute and Independence, Kansas.

There was this further fact concerning all respondent's activities which appellants consider of prime importance. The ultimate control and management rested in the officers and heads of the various departments, in Kansas City, Missouri. They had the power to accept or reject any news article received, whether coming from the Associated Press or any of the several news services mentioned, or written by respondent's own news and editorial force. In the latter instance the article could be changed in meaning and substance. Similar supervision extended to advertising and circulation. But a

large measure of discretion was left in the trained personnel of these several departments.

So much for the facts. Now as to the statutes relied on by appellants. Sec. 10115, Laws Mo. 1931, p. 365, is long and involved and is printed in seven divisions. Division I levies an annual income tax on individual persons. Income taxes against domestic and foreign corporations of the class to which respondent belongs are covered by divisions 3 and 7 of Section 10115. There is elaborate definition of "income" in Section 10117, Revised Statutes 1929, Laws Missouri 1931, page 363 (Mo. Stat. Ann., p. 8091). We set out in the margin*

---

*(t) "Income shall include all gains, profits and revenues from the transactions of the business of the corporations in this state, including gains, profits and revenue from the doing in this state of such portions of each transaction of the business of the corporation which transaction is partly done in this state and partly done in another state or states, and all other income from sources in this state *as income is otherwise defined.* From said income shall be deducted all of the ordinary and necessary expenses incurred in this state to produce said income, . . .

(u) *"Provided,* that where income results from a transaction partially in this state and partially in another state or states, and income and deductions of the portion in the (this) state cannot be segregated, then such portions of income and deductions shall be allocated in this state and other state or states as will distribute to this state a portion based upon the portion of the transaction in this state and the portion in such other state or states;

(v) *"Provided, however,* the taxpayer may elect to compute the portion of income from all sources in this state in the following manner: The net income from all sources shall be determined as now or hereafter may be provided, . . . The amount of *sales* which are transactions wholly in this state shall be added to one-half of the amount of sales which are transactions partly within this state and partly without this state, and the amount thus obtained shall be divided by the total sales.

(w) "or in the cases where sales do not express the volume of business, the amount of *business* transacted wholly in this state shall be added to one-half of the amount of business transacted partly in this state and partly outside this state and the amount thus obtained shall be divided by the total amount of business transacted, and the net income shall be multiplied by the fraction thus obtained, to determine the proportion of income to be used to arrive at the amount of tax, and the amount of tax shall be such per centum thereon as may now or hereafter be provided. . . .

(x) "Seventh. Any corporation taxable under subdivisions 3, 4 or 6, shall elect to determine net income applicable to this state by multiplying the total net income from all sources by the fraction determined in the manner in said respective subdivisions set forth; first by filing written notice with the auditor on or before the due date of the return of the taxpayer's election, or, second by failing to keep its books and records in such manner as to show the net income applicable to this state, including gross income and deductions applicable thereto:

(y) *"Provided, however,* that if such corporation shall keep its books and records so as to show by any other method of allocation between this state and other states involved of net income from transactions partially within and partially without this state, including gross income and deductions applicable thereto, and such method shows the net income applicable to this state. . . ., then it may, on or before sixty days before the end of any

the parts of these sections relied on by appellants, and have broken the quoted matter into lettered paragraphs, in a few places adding emphasis. Hereafter we shall refer to the several parts of Section 10115 by said lettered designations of the paragraphs.

■ Turning to appellant's first contention, that respondent failed to petition for and obtain the Auditor's approval of its allocation of income, as required by Section 10115. Let it be kept in mind that paragraphs (t), (u), (v) and (w) supra, of division 3 of the section impose an income tax on business transactions wholly and partly done within the State; require an allocation of the latter if the income from the extrastate part cannot be segregated; and provide an elective formula. Following that division 7 of the section (paragraph x) supra, provides the corporation shall make the election in one of two specified ways to use the formula. Then comes a proviso (paragraphs y and z) that if such corporation shall keep its books and records so as to show by any other method the net income allocable to this State from such dual character transactions, it may petition the State Auditor for permission to make its return accordingly; and if the Auditor finds the proposed method correctly shows the net income applicable to this State he shall notify such corporation that it may use said method as long as it shows the net income applicable to this State.

Now the evidence shows respondent did not present to the Auditor a written petition for leave to allocate its net income for either 1934, 1935 or 1936 according to its newspaper circulation within and without the State, and the Auditor did not notify respondent that such method might be used. But the undisputed proof further shows returns were successively filed on that basis for each of said years and for seven years theretofore; that no objection was made to the method of allocation; the tax money was accepted; the figures are not questioned; and the complaint now made (in the point under discussion) is that said petition was not filed and consent obtained. Appellants cited decisions such as Ada County v. Boise Commercial Club, 20

taxable year petition the state auditor, in writing, to be permitted in its return required to be filed to apportion to this state according to the method shown by such books or records,

(z) "and, if the state auditor finds that such method does show the net income applicable to this state . . ., he shall notify such corporation at least thirty days prior to the last day on which such corporation's return for said taxable year is to be filed that it may use said method as long as such method shows the net income applicable to this state, . . ."

Sec. 10117.—"Income shall include gains, profits and earnings derived from salaries, wages or compensation for personal services of whatever kind and in whatever form paid; and from professions, vocations, *businesses*, trade, *commerce*, . . . and gains, profits and earnings from any other transactions of any business carried on for gain or profit; and from any source whatever; . . . and gains, profits and earnings from any use or sale of real or personal property in this state, . . . shall be considered as from sources in this state."

Idaho, 421, 424, 118 Pac. 1086, 1094; Commonwealth v. Kentucky Distilleries & Warehouse Co., 143 Ky. 314, 328, 136 S. W. 1032, 1039; Commonwealth v. Quaker City Cab Co., 287 Pa. 161, 170, 134 Atl. 404, 407; City of Louisville v. Board of Education, 154 Ky. 316, 317, 157 S. W. 379, 380.

These, in general, were cases where the public authorities for a long period of time had failed to enforce and collect *ad valorem* or license taxes, mostly in instances where the statute was ambiguous. They announce the general rule that "nonaction upon the part of the officers of the State is not to be treated as contemporaneous construction" of an ambiguous law; and that "administrative construction . . . cannot prevail against the plain language of the statute." That is true, but in the cases cited it was the absolute duty of the officers to collect the taxes, whereas in the instant case the plain language of subdivision 7 of Section 10115, paragraph (z) above, expressly vested the Auditor with a *discretion*—a right to determine whether respondent's method of allocation did show the net income allocable to this State, and to authorize its use if he found the method proper. If the Auditor exercised that discretion, as the statute allowed him to do, he was not giving away money belonging to the State even though no formal petition for the apportionment had been filed. ■ The filing of the verified returns, themselves, was an implied request for their approval. As was well said in State ex rel. Davern v. Rose, 140 Wis. 360, 365, 122 N. W. 751, 28 L. R. A. (N. S.) 194, "no wrong in the legal sense results when one receives all that the law accords him. So when the only right of an individual or the public which the law gives is that which a designated officer deems best, the honest decision of that officer is the measure of the right, . . ."

■ A contention very similar to the one made by appellants here, was dealt with in Montgomery Ward & Co. v. State Tax Commission, 151 Kan. 159, 98 Pac. (2d) 143, in January of this year. The taxpayer had filed returns disclosing fully the methods of accounting and apportionment of net receipts. The Kansas Tax Commission audited them "in due course" and disallowed the allocation of certain income to sources outside the State.. An additional tax was imposed to cover these omitted receipts. The taxpayer asked and was accorded a hearing at which relief was denied, whereupon it appealed to the proper court. There, for the first time, the Tax Commission contended the taxpayer had not complied with procedural requirements of the statute by securing permission to use a new method of allocation. The Kansas Supreme Court overruled this contention. The instant facts are parallel but stronger against appellants for they had accepted respondent's returns for ten years and did not question the apportionment of income in the 1934, 1935 and 1936 returns until 3 years

after the first one had been filed. And so we hold the failure of respondent to petition for and obtain consent to make allocation on the basis shown in the returns did not destroy appellants' discretionary approval of it.

But appellants further contend respondent's tax returns for 1934, 1935 and 1936 did not clearly show it had elected to allocate its income according to circulation, under paragraphs (y) and (z) of Section 10115. We notice that contention briefly. Recall again that paragraphs (v) and (w) of the section provide an elective formula for allocation. Appellant's forms of Income Tax Return contemplated the use of that formula, calling for every figure, addition, subtraction, division and multiplication involved therein, to be inserted on separate numbered lines. That form was not adapted to showing the method of allocation employed by respondent, so several of the lines were not filled in. But the return did show the total net income from all sources and the taxable percentage thereof. This, of itself, was enough to indicate respondent was using a method of allocation other than the formula and therefore necessarily coming under paragraph (y) since there was and could be no actual segregation under paragraph (u). Appellants expressly concede the income was allocated according to newspaper circulation, and that the figures and percentages were correct. They tacitly admit they knew at the time how the income was allocated. We find no merit in this contention.

Considering next appellants' second assignment: that all of the respondent's income for the three years in question "resulted" from the conduct of its business in Missouri and was derived wholly from sources in this State, so that there was no statutory warrant for apportioning it on the basis of newspaper circulation inside and outside the State. Appellants reasoning runs as follows. Division 3 of Section 10115, paragraph (t), supra, requires the taxation of all income from transactions wholly within this State, plus that part of income arising from sources in this State when another part of the income from the same transactions arises from sources outside the State. When income arises from transactions wholly outside the State it is not taxable. The language of the statute is broad, including all gains, profits and revenues from business transactions, together with "all other income from sources in this state as income is *otherwise defined.*" (Italics ours.) Income is "otherwise defined" in Section 10117, and appellants therefore contend that definition must be considered as having been adopted by said division 3 of Section 10115, wherever applicable. Said definition in Section 10117, includes gains, profits and earnings from business, trade and *commerce.* From this appellants argue that where all the principal business is done in this State by which goods or services are sold in interstate commerce, the income must be regarded as arising wholly from sources in this State, and is taxable as such.

Arguing further from principle and texts and decisions construing the Federal income tax law and statutes of other states,* appellants say the *source* of the income is determined by the nature and location of its producing cause. If it be from labor, the place where the labor was performed is decisive; if it be from capital the place where the capital was employed, governs. The source is not merely the place where the income was captured by delivery of the finished product and collection of the proceeds. The question is, where was the income earned or produced. But, say appellants, when a business is "unitary" the place where the business is carried on fixes the *situs* of the income, and things done elsewhere will be treated as "incidental"—especially when they were controlled or subject to confirmation in the taxing jurisdiction.

We agree to the first part of this thesis, holding the source of the income is the place where it was produced, but cannot assent to the latter part making an exception when the business is unitary—though the Wisconsin, Georgia and North Carolina cases just cited in the margin may lend some color to it—not forgetting, however, they were governed by their own statutes. The cases in 279 U. S. 306, and 85 Fed. (2d) 322, seems to be authority for the proposition that where every act involved in the production and sale of a commodity was performed in a given jurisdiction except the closing of sale contracts and collection of the sale price, the whole income tax is due there. The case in 303 U. S. l. c. 258, is stressed by appellants because of its holding that "the business of preparing, printing and publishing magazine advertising is peculiarly local and distinct from its circulation whether or not that circulation be interstate commerce." But the question there was whether the business was subject to a *privilege* tax measured by gross receipts. The court held it was, but the case is clearly not in point on the question whether the source of a part of the income from the business was extrastate for the purpose of taxing income as such. Well considered decisions of the United States Supreme Court hold the fact that a business is unitary does not prevent the allocation of its income for taxation when parts of its productive activities are conducted in other States. [Hans Rees' Sons, Inc., v. North Carolina, 283 U. S. 123, 133, 75 L. Ed. 879, 51 Sup. Ct. 385.]

We cannot take the space to review the foregoing decisions in greater detail. Furthermore the instant facts and the provisions of

*Holmes on Federal Taxes (6 Ed.), sec. 396; Ludlow-Saylor Wire Co. v. Woolbrinck, 275 Mo. 339, 355, 205 S. W. 196, 199; U. S. Glue Co. v. Oak Creek, 161 Wis. 211, 218, 153 N. W. 241, 243; Montag Bros., Inc., v. State Revenue Comm., 50 Ga. App. 660, 665-6, 179 S. W. 563; Compania General v. Collector, 279 U. S. 306, 73 L. Ed. 704, 49 Sup. Ct. 304; Comr. of Int. Rev. v. East Coast Oil Co., 85 Fed. (2d) 322; Maxwell v. Kent-Coffey Mfg. Co., 204 N. C. 365, 168 S. E. 397; Western Live Stock v. Bureau of Revenue, 303 U. S. 250, 82 L. Ed. 823, 58 Sup. Ct. 546.

our own statutes are controlling here. The latter are very broad. The various lettered paragraphs of Sections 10115 and 10117, heretofore cited in the margin, show the legislative intent was to tax all net gains, profits and revenues of the corporation earned in every way that money could be earned in the transaction of the corporate business. The word "transaction" as frequently used in the singular and plural, is practically all inclusive, and signifies any business activity productive of income. As said in Artophone Corporation v. Coale (Div. 2), 345 Mo. 344, 133 S. W. (2d) 343, 348(8) "it may comprehend a series of many occurrences, depending not so much upon the immediateness of their connection as upon their logical relationship." [See also Webster's New International Dictionary.] This is shown by the fact that paragraphs (v) and (w) supra, of Section 10115 permit the allocation of taxable income to be based generally on the volume of sales or business.

But the taxable income is the *net* income. Ordinary and necessary expenses are deducted; and the provisions of both Section 10115 and Section 10117 clearly indicate that on an allocation it is the net income which is apportioned on the basis of "transactions" partly done in this State and partly in another State. In other words the process does not contemplate that *gross* income is first apportioned, and then only expenses incurred in Missouri are deducted from Missouri's part, and expenses incurred outside are deducted from the extra-state part. If the outlay in producing Missouri's portion of the income were chiefly made outside the State, great injustice would result if it were not required to bear its share of the expense. Indeed, expenditures made in securing and doing business, and collecting the revenues therefrom, all are necessary parts of business activities producing income—that is to say, they enter into the transactions on the basis of which the net income is allocated.

When we consider the far flung activities of respondent's enterprises: the branch office and news bureaus in Kansas; the news bureau in Washington, D. C.; the numerous correspondents living and working all over the world; the cooperative news gathering agencies such as the Associated Press and the North American Newspaper Alliance, of which respondent is an integral part; the branch advertising offices in New York and Chicago; the non-resident advertising and circulation solicitors and distributors; it is hard for us to see any colorable basis for appellants' contention that respondent's income "results" solely from the work and supervision at the principal office in Kansas City, Missouri, and that the outside activities do not produce income. How could there be income without news to print, circulation built on that news coverage, advertising attracted by circulation, and finally distribution of the newspapers and collection of the subscriptions and advertising bills. All these and the labor and capital employed therein enter into the production

of income, and in that sense make the business unitary; but under our statutes the income must be allocated when produced by transactions done partly within and partly without the State. If no part of the income is attributable exclusively to sources inside or to sources outside the State, then all must be allocated.

A few paragraphs back we agreed with appellants' contention that the source of income is the place where it was earned or produced —if by labor, the place where the labor was performed; if by capital, the place where the capital was employed. From this it follows that unless labor or capital is utilized outside this State in business transactions, the income therefrom must be regarded as arising wholly from sources in this State and is not allocable even though the transactions were done in interstate commerce. This we think would be true of respondent's purchases outside the State of newsprint and rotogravure sections; also of news service bought as a commodity from the New York Times-Chicago Tribune Service and the International News Service—if these matters were handled wholly by correspondence or similar communications from Missouri without the employment of labor or capital outside the State. The same would be true of radio programs broadcast from Missouri to outside areas without labor there. But in these and other transactions if labor was employed outside it would make no difference that the employees did not live in other states and were regularly and systematically sent out from the home office. [Artophone Corporation v. Coale (Div. 2), supra, 345 Mo. 344, 133 S. W. (2d) 343, 348(9).]

In that case Division 2 of this court held that where the taxpaying corporation regularly sent traveling salesmen from its chief (and only) office in Missouri to other states in which they solicited orders for merchandise; and those orders were subject to approval by the home office and were filled from that office or by the manufacturer—on those facts, we say, this court held such transactions were partly within and partly without this State, and subject to allocation under Section 10115. The Auditor unsuccessfully contended that said transactions arose wholly from sources in this State; and that there could be no allocation in such instances unless the taxpayer maintained a *branch office* in the other state. Appellants make the same contention again here, and ask us to overrule the Artophone case.

We decline to do so. There is nothing in the statutes calling for such an arbitrary distinction. The principal cities of this State are on its borders: Joplin; (Springfield close to the line); Kansas City; St. Joseph; Hannibal; St. Louis; Cape Girardeau. There are numerous smaller but important centers. To say that all income from the corporate merchandising and similar businesses transacted out of those cities in bordering states by the employment of labor and capital therein, arises wholly from sources in this State—unless such corporations go across the line and set up branch offices—would not

accord with public policy or the legislative intent as we read the statutes. If income is earned partly by the employment of labor or capital outside the State, regularly and in due course, we think it should be apportioned under the statute. And this is true whether the extrastate portion of the income is subject to income tax in the other State or not (provided, the Missouri income tax levied on business done in interstate commerce did not impose on it more than its just share of the tax burden. [Western Live Stock v. Bureau of Revenue, supra, 303 U. S. 1. c. 254 et seq.]). In so holding, we conceded some of the foreign decisions cited by appellants tend to support their view, as we have already stated. And we recognize also the difficulty of enforcing the law is increased if in the computation of the tax the Auditor must descend to details. But the rule is well settled that our taxing statutes should be construed strictly against the taxing authority unless a contrary legislative intent appears. [Artophone Corporation v. Coale, supra, 345 Mo. 344, 133 S. W. (2d) 1. c. 347(2).]

We agree with appellants that the portion of respondent's income attributable to capital and labor employed at the home office in Kansas City, Missouri, must be regarded as having its source in Missouri. Appellants say that conclusion is contrary to the holding in F. Burkhart Mfg. Co. v. Coale, 345 Mo. 1131, 139 S. W. (2d) 502, recently decided by Division 2 of this court, and ask us to overrule that case. There, a Missouri manufacturing corporation owned factories in several other states, which were operated as separate business units. Each factory had its own quota of salesmen; orders were sent in by these men from outside states to their respective plants and were accepted and filled there, and the bills collected there. The corporation retained only a "directory control" over the outside plants, vested in its executive officers who lived in Missouri. On these facts this court held income from these outstate plants was *wholly* derived from sources outside this State and was not subject to income tax in this State at all.

Appellants contend that ruling was erroneous because the "directory control" by the executive officers in Missouri over the foreign plants was labor performed in this State, at least in part producing the income of those plants, which made that income subject to allocation under Section 10115. The Burkhart case was submitted on an agreed statement of facts. It, or at least our opinion, does not disclose what if any actual supervision or control the executive officers exercised over the foreign plants. If it efficiently entered into the processes by which income was earned, we think appellants are right. That such supervision may have a value is established by cases allowing a utility to pay a fixed charge to a holding company for supervisory services. [State ex rel. City of St. Joseph v. Pub. Serv.

Comm.; St. Joseph Water Co., Intervener, 325 Mo. 209, 223, 30 S. W. (2d) 8, 14(12).]

We entertain no doubt that the services performed by the Associated Press for respondent outside of Missouri should be credited to it as extrastate labor. The Association acts as an agent and instrumentality for its members and they reciprocally act for it and each other. It operates as a non-profit cooperative organization with expenses paid by assessments against the members. [Associated Press v. National Labor Relations Board, 301 U. S. 102, 128, 132, 81 L. Ed. 953, 57 Sup. Ct. 650; National Labor Relations Board v. A. S. Abell Co., 97 Fed. (2d) 951, 954.] The same is true of similar services furnished by the North American Newspaper Alliance. Also it is plain that in delivering newspapers to Kansas City, Kansas, in its own trucks respondent performs labor outside the State of Missouri. The fact is not changed when respondent hires trucks on a tonnage basis to deliver newspapers to distributors outside the State, for the truck transporter becomes respondent's agent. [Taussig v. The Southern Mill & Land Co., 124 Mo. App. 209, 216, 101 S. W. 602, 604; Street v. Werthan Bag & Burlap Co., 198 Mo. App. 336, 350-1, 200 S. W. 739, 742.]

When distributors and carriers solicit newspaper subscriptions for respondent they undoubtedly act for it. We are in doubt whether the labor performed by them in distributing papers can be credited to respondent as labor performed outside the State, for it appears from the evidence that the newspapers are *sold* by respondent to the distributor, title passes, and he employs the carriers. Nevertheless, in selling advertising respondent bases its rates on circulation and makes itself responsible to the advertiser for delivery of the newspapers to subscribers. Its contracts with distributors exact prompt and accurate circulation, and much labor outstate is expended in maintaining a high standard in that work. The facts stated in the preceding paragraphs lead us to the conclusion that appellants' second assignment of error is without substance.

Appellants complain also of the trial court's refusal to make thirteen findings of fact requested by them. A number of these requested findings declared that one or another of respondent's business activities was guided, directed, controlled or supervised by the home office. All such were refused as not necessary to a determination of the case. The same disposition was made of another finding that the Auditor had promulgated a rule during the years 1934, 1935 and 1936, declaring the total net income of manufacturing and business companies subject to income tax unless they had a branch house or capital investment outside the State. This was the rule overturned in the Artophone case. Still another series of findings declared that no income resulted from specified activities of respondent's enterprises. These were refused outright, as were two others

stating that all advertising solicited was subject to refusal or approval by the home office. The court did not err in rejecting these findings. The appellants' briefs contain 114 pages; respondent's 108 pages. We have extended the opinion for that reason and because of the importance of the case. But we have said enough.

Finding no error the judgment is affirmed. All concur.