WADSWORTH, APPELLEE, *v.* DAMBACH ET AL., APPELLANTS.

(No. 270—Decided May 24, 1954.)

*Mr. Melvyn J. Stauffer,* for appellee.
*Messrs. True & Meyer,* for cross-petitioners.
*Mr. C. William O'Neill,* attorney general, and *Mr. Joseph S. Deutschle, Jr.,* for appellant.

FESS, P. J.   On motion of appellee, an appeal on questions of law and fact was dismissed on the ground that the primary

relief sought, as disclosed by the allegations of the petition and cross-petition, is at law. The appeal is retained for determination on questions of law. Plaintiff and cross-petitioners bring this action against the defendants for a declaratory judgment with respect to the provisions of Section 1427 General Code (Section 1533.45, Revised Code).

Section 1427, General Code, provides:

"No person shall draw, set, place, locate or maintain any net whatever on any of the reefs of the Lake Erie fishing district, except by permission of the chief of the division of wild life, or draw, set, place, locate or maintain any net whatever, in any channel or passage lying between any islands or between any island and the mainland in such district at a greater distance from the shore of such islands or mainland than one-fourth the distance across such channel or passage; nor set, locate, place or maintain any net or string of nets opposite another net or string of nets in such a manner as will close off more than one-fourth the distance across any such channel or passage; nor shall any person draw, set, place, locate or maintain any net whatever in Sandusky Bay within the area bounded by an imaginary line running from a point in the north shore one-half mile west of and parallel to the Sandusky Bay motor vehicles bridge toward the south shore to a point in said line one-half mile west of the abutment of the southerly opening of said bridge, thence in a southerly direction to a point on the south shore in the middle of the west end of Woodland Trail, Bayview Allotment, and an imaginary line running from the north shore toward the south shore one-half mile east of and parallel to the New York Central railroad bridge to a point in said line one-half mile east of the abutment of the southerly opening in said railroad bridge, thence in a southerly direction to a point in the New York Central Railroad right-of-way three thousand feet from said railroad bridge abutment; nor within one hundred and twenty-five rods of each side of a line drawn straight from the center of the new highway embankment to Eagle Island and of a line drawn straight from the center of the New York Central railroad embankment to the Baltimore and Ohio elevator dock in Sandusky for a distance of two miles from each embankment along each line. All points so desig-

nated where the above so-called imaginary lines touch the shore shall be clearly marked by some suitable marker installed by the conservation department. No person shall draw, set, place, locate or maintain any net whatever within a radius of one-half mile from a pier or breakwater built or maintained by the United States government, or at within one-half mile from the mouth of any river flowing into Lake Erie, or within one-half mile of any embankment, dam or bridge in any bay connected with or flowing into Lake Erie, or more than one-fourth the distance from shore across any bay whose waters flow into Lake Erie, or set, place, locate or maintain any net or string of nets opposite another net or string of nets in such manner as will close off more than one-fourth the distance across such bay.''

Petitioners are owners of land abutting upon Sandusky Bay and for a number of years have been engaged in commercial fishing by the use of seines along the beaches fronting upon their premises and extending into the bay. They allege that the Division of Wildlife, Department of Natural Resources, and its predecessor executive and administrative officers charged with the enforcement of the provisions of Section 1427, General Code, have, uniformly since the original enactment of the statutes incorporating such provisions, interpreted such provisions as applying only to fyke nets, trap nets and other set twine and have uniformly interpreted such acts not to apply to seines and the operation of seines and the laying out and pulling thereof within the described areas; and that relying upon said uniform interpretation of the statute, petitioners have invested large sums of money in seines and seining equipment which can not properly or profitably be operated, laid out or pulled from the shores without laying them within the described areas.

Petitioners allege further that the defendants, contrary to many years administrative interpretation which has been acquiesced in by the Legislature, are now claiming that the statute applies to the use of seines in such areas and prohibits the operation thereof therein, and that defendants threaten to enforce against petitioners the provisions thereof. Petitioners pray for a declaratory judgment and injunctive relief.

The question presented is exclusively one of statutory con-

struction. It is elemental that where the language of a statute is plain and unambiguous and conveys a clear and definite meaning there is no occasion for resorting to the rules of statutory interpretation. *McCormick v. Alexander*, 2 Ohio, 65; *Sears v. Weimer*, 143 Ohio St., 312, 55 N. E. (2d), 413; *Wachendorf v. Shaver, Recorder*, 149 Ohio St., 231, 236, 78 N. E. (2d), 370. Neither is it the function of a court to set forth what it thinks the statute under consideration should provide, or to give to the statute an operation which the Legislature does not intend. Nothing may be read into or out of the statute which is not within the manifest intention of the Legislature or gathered from the act itself. *Sears v. Weimer, supra.* The question is not what did the General Assembly intend to enact, but what is the meaning of that which it did enact. *Slingluff v. Weaver*, 66 Ohio St., 621, 64 N. E., 574.

Does the phrase "any net whatever" as employed in Section 1427, General Code, include a "seine?" The word "whatever" neither adds nor detracts from "any net" and has been deleted in the Revised Code. According to the dictionary, a seine is a large net of a particular type. In general, words of a statute in common use will be construed in their ordinary acceptation and significance and with the meaning commonly attributed to them. *Baker v. Powhatan Mining Co.*, 146 Ohio St., 600, 67 N. E. (2d), 714; *State, ex rel. Church of the Nazarene, v. Fogo, Registrar*, 150 Ohio St., 45, 79 N. E. (2d), 546. Application of this principle would exclude any further interpretation of the statute. But the question as to the meaning of a term used in a statute is not necessarily what that terms means in general use, but what it means in the particular statute in which it is found. In *State, ex rel. Belford, v. Hueston*, 44 Ohio St., 1, 4 N. E., 471, the court construed the words "senior judge" to mean the judge who had served longest under his present commission and not the judge who had been longest in continuous service. Compare *State, ex rel., v. Fogo, supra*, holding that the term "school" did not include "Sunday school" and "Bible school." In *Baker v. Powhatan Mining Co., supra*, although the court applied the principle that a word in a statute will be given its ordinary connotation, the court held that the word "strike" as used in the unemployment compensation act in-

cludes cessation of work and therefore a labor dispute. There is a further principle that in construing the language of a statute regulating a business it should be given the meaning as understood in the business rather than its ordinary meaning. 50 American Jurisprudence, 263, Section 277; 82 Corpus Juris Secundum, 652, 654, Sections 330, 331. Innumerable cases have been decided construing the meaning of ordinary words as used in a statute. Cf. 82 Corpus Juris Secundum, 676, 681, Section 338; 37 Ohio Jurisprudence, 578 to 586, Section 315 *et seq.* In general, in the absence of specific statutory definition, any word used in a statute may be subject to judicial interpretation. Although admittedly the question is not free from doubt, we conclude that there is sufficient ambiguity in Section 1427, General Code, for the admission of evidence to ascertain whether it was the intent of the General Assembly to prohibit the use of seines in the prescribed area.

Incident to a determination of this appeal we have reviewed the history of the legislation culminating in the current form of Section 1427, General Code, and have examined the following statutes: 66 Ohio Laws, 348 (1869); 68 Ohio Laws, 41 (1871); Section 6968, Revised Statutes; 77 Ohio Laws, 135 (1880); 78 Ohio Laws, 247 (1881); 80 Ohio Laws, 109 (1883); 81 Ohio Laws, 94 (1884); 82 Ohio Laws, 243 (1885); 83 Ohio Laws, 189 (1886); 84 Ohio Laws, 222 (1887); 85 Ohio Laws, 271 (1888); 86 Ohio Laws, 317 (1889); 87 Ohio Laws, 275 (1890); 88 Ohio Laws, 69 (1891); 89 Ohio Laws, 26 (1892); 92 Ohio Laws, 384 (1896); 93 Ohio Laws, 303 (1898); 94 Ohio Laws, 215, 321, 349 (1900); 95 Ohio Laws, 377, 394 to 401 (1902); 97 Ohio Laws, 461, 475 (1904); 98 Ohio Laws, 257 (1906); 99 Ohio Laws, 364, 373 (1908); Sections 1425 to 1465, General Code (1910 Edition); 102 Ohio Laws, 97 (1911); 108 Ohio Laws, Pt. 1, 577, 587 (1919); 108 Ohio Laws, Pt. 2, 1107 (1920); 113 Ohio Laws, 551, 577, 697 (1929); 123 Ohio Laws, 84, 141 (1949); and 124 Ohio Laws, 290, 292 (1951).

The first act for the protection of fish applied to inland waters only. 66 Ohio Laws, 348 (1869). It employed the expression "put in, keep up, draw or use any fish net, fish seine or fish pound for the purpose of catching fish," etc. This act, as amended in 1871 (68 Ohio Laws, 41), was carried into Sec-

tion 6968 of the Revised Statutes in revised phraseology, referring to "fish pound, fish net, fish trap, or fish seine, except seines to catch minnows." Section 6968, Revised Statutes, was frequently amended in the ensuing twenty years. The first effort to regulate fishing in Lake Erie was made in 1884 (81 Ohio Laws, 94). Prior to 1902, the statutes made a distinction between "nets" and "seines" and in referring to "nets" employed the phrase "set, place or locate" and in referring to "nets and seines" employed the phrase "*draw,* set, place or locate."

Regulation of the placing of nets in the Sandusky Bay area was first enacted in 1896 (92 Ohio Laws, 384). Section 6968-1, Revised Statutes, as amended, provided in part as follows:

"No person shall *draw,* set, place, locate or maintain any pound-net, seine, gill-net, trap or fish-net whatever in the waters of Lake Erie between the 15th day of December and the 15th day of March; nor in Sandusky Bay" between certain dates "no person shall set, place, locate or maintain any pound or trap-net in Lake Erie at a greater distance than eight miles from the shore or mainland. No person shall set, place, locate or maintain any pound or trap-net in such waters at a greater distance than four miles from the shore of any island, provided, however, that no person shall set, place, locate or maintain any fish-nets in any channel or passage lying between any island and any other island * * * No person shall set, place, locate or maintain any gill-net * * * in any waters of Lake Erie [except] where the water is fifty feet deep or over. No person shall set, place, locate or maintain any fish-nets on any of the reefs of Lake Erie. No person shall set, place, locate, or maintain any net whatever within a radius of one-half mile from any pier or breakwater built and maintained by the United States government * * * nor within one-half mile of any embankment, dam or bridge in any bay or river connected with or flowing into Lake Erie, nor more than one-third the distance across any bay or river whose waters flow into Lake Erie." (Emphasis added.)

In the penalty section (6968-2) it is provided:

"* * * No person shall *draw,* set, place, locate or maintain

any fish-net, trap, pound-net, *seine,* gill-nets or any device for catching fish as is by law forbidden; and any nets, *seines,* pound-nets, gill-nets, or other devices for catching fish, set, placed, located or maintained in violation of the provisions of the laws of the state, shall be taken wherever found by the fish wardens or other proper officer; and all such nets and other devices for catching fish are hereby declared a public nuisance and shall be forfeited to the state.'' (Emphasis added.)

The fifth subparagraph of Section 6968-4, Revised Statutes, provided:

''The finding of any nets, fishing devices or other articles set or maintained in violation of any law shall be prima facie evidence of the guilt of the person or persons owning or operating the same.''

It will be noted that although the separate classification of ''nets'' and ''seines'' is not as distinctive as in prior enactments, the 1896 amendment does continue the distinction between drawing a seine and setting a net. In the 1902 amendment (95 Ohio Laws, 377, 394 to 401), the distinction between net and seine substantially disappears, but the phrase ''draw, set, place, locate or maintain'' is applied to ''pound-net, gill-net, seine, trap-net, or fish-net whatever.'' It also provided that ''no person shall draw, set, place, locate, or maintain any net whatever * * * more than one-fourth the distance across any bay or river whose waters flow into Lake Erie.'' In the 1908 consolidation and revision of the laws relating to fish and game (99 Ohio Laws, 364, 373) the phrase ''draw, set, place, locate or maintain'' was employed uniformly to nets and seines and ''any net whatever.'' The provisions of this act were carried as Sections 1425 to 1465 of the 1910 General Code.

In 1911 (102 Ohio Laws, 97), Section 1439, General Code, was amended to read as follows:

''No person shall draw, set, place, locate or maintain any net whatever on any of the reefs of the Lake Erie fishing district, or draw, set, place, locate or maintain any net whatever in any channel or passage lying between any islands or between an island and the mainland in such district at a greater distance from the shore of such island or mainland than one-fourth the distance across such channel or passage; nor shall any person

draw, set, place, locate or maintain any fish net within a distance of one hundred and twenty five (125) rods of a line drawn through the center of Sandusky Bay within a distance of two miles on either the west or east side of the track of the Lake Shore and Michigan Southern Railway crossing such bay.''

The prohibition against fishing on reefs is old, having been first enacted in 1883 (80 Ohio Laws, 109), but this 1911 amendment is the origin of the restriction relating to fishing in the particular area involved in the instant case.

In the 1919 codification of the fish and game laws (108 Ohio Laws, Pt. 1, 577, 589), Section 31 (Section 1420, General Code) starts out ''no person shall draw, set, place, locate, maintain, or have in possession, a pound net, crib net, trammel net, fyke net, set net, *seine,* bar net, fish trap,'' etc. Section 32 (Section 1421, General Code) provides that carp may be taken in any number, ''except that they may not be taken with a net other than a seine,'' etc., and also that ''it shall be unlawful to set or leave stationary a seine that will prevent fish from entering or going from the mouth of any river,'' and ''in the Lake Erie fishing district a seine of smaller mesh may be used.'' Section 38 (Section 1427, General Code) appears in substantially its present phraseology, except that it retains the restriction with respect to drawing, setting, etc., of any fish net within a distance of 125 rods of a line drawn through the center of Sandusky Bay within a distance of two miles on either the west or east side of the track of the New York Central Railroad crossing of such bay.

On April 5, 1929 (113 Ohio Laws, 551, 577), incident to the creation of the Department of Conservation, Section 1427, General Code, was re-enacted. The only change was the substitution of the ''conservation commissioner'' for the ''secretary of agriculture.'' But on April 27, 1929 (113 Ohio Laws, 697), an act was filed in the office of the Secretary of State amending Sections 1421, 1425, 1427 and 1447. Since each of these acts was passed concurrently, Section 1427, as amended in 113 Ohio Laws, 577, and Section 1427, as amended in 113 Ohio Laws, 699, were each included in Page's Ohio General Code. The only change in Section 1427 reported on page 577 of 113 Ohio Laws was the insertion of ''conservation commissioner'' in lieu of ''di-

rector of agriculture." But Section 1427, recorded on page 699 of 113 Ohio Laws, restored the Director of Agriculture and further provided "nor *shall any person draw, set, place,·locate or maintain any* (* * *) net *whatever* (* * *) *in Sandusky Bay within one hundred and twenty-five rods on each side of a line drawn straight from the center of the new highway embankment to Eagle Island and of a line drawn straight from the center of the New York Central Railroad embankment to the Baltimore and Ohio elevator dock in Sandusky for a distance of two miles from each embankment along each line.*" The italicized portion of the quotation was new language.

In the act approved May 9, 1949 (123 Ohio Laws, 84, 141), creating the Department of Natural Resources, Section 1427 (113 Ohio Laws, 699) and Section 1427 (113 Ohio Laws, 551) were repealed and Section 1427 (113 Ohio Laws, 551) was re-enacted by inserting "chief of the division of wild life" for "conservation commissioner."

On June 2, 1951, Section 1427, General Code, was again amended in its present form. ·This amendment also provided that "all points so designated where the above so-called imaginary lines touch the shore, shall be clearly marked by some suitable marker installed by the conservation department."

We now come to an analysis of the phraseology employed in the 1951 act (124 Ohio Laws, 290) amending Sections 1421, 1425, 1427, 1427-1 and 1454, and enacting Section 1427-2, General Code. As indicated above, the statutory distinction formerly made with respect to nets and seines and setting nets and drawing seines disappeared a number of years ago.

Section 1421 provides in part that "carp, mullet, * * * sheepshead and moon-eyed shiners may be taken with a *seine* only." It provides further that "on or after March 15, 1946, the meshes of one-third of each wing of a seine shall measure not less than five inches, stretched mesh, fishing measure, measured on the bar as provided in Section 1428-4 of the General Code, in the bays, * * * bordering upon * * * Lake Erie, except such of these waters that are in the Lake Erie fishing district where they may be taken *with other nets* as provided in this act." This phraseology would seem to indicate that seines were included in the word "nets."

The section provides further that nothing in the act shall be construed to permit the use of *any net whatever* in any stream flowing into Lake Erie east of the mouth of Sandusky Bay except a minnow net. The section provides further that on or after January 1, 1952, "no person shall draw, set, place, locate or maintain any net or *seine* whatever except minnow net in that portion of Sandusky Bay or Lake Erie" in the area of Cedar Point, Johnson's Island and the loading dock of the Baltimore & Ohio Railroad. The section provides also that no person shall draw, set, place, locate or maintain any net whatever, except a minnow net, in another portion of Sandusky Bay.

In Section 1425 it is provided that no person shall use in fishing in the Lake Erie fishing district any gill net, bar net, trap net, crib net, fyke net, pound net, *seine* or trotline, without having painted or stamped thereon the name of the owner, etc.

In Section 1427, the interpretation of which is in question in the instant case, the phrase "draw, set, place, locate or maintain *any net whatever*" is employed three times without specifically naming any particular class of nets or mentioning "seines."

Section 1427-1 provides that no person shall draw, set, place, locate or maintain any net whatever within one-quarter of a mile of any island or reef in Lake Erie, etc.; and that no person shall draw, set, place, locate or maintain any net whatever, *except a seine*, dip net or bar net within one-quarter of a mile of the mainland. This section provides further that no seine or net of any kind, except minnow net, shall be placed, located, pulled or maintained, etc.; and no seine shall be set, placed, located or maintained in Sanduskky Bay, etc. From analysis of these several provisions of the 1951 act, it is apparent that in certain instances the term "net whatever" was intended to include "seine" and that in several instances a seine is excepted from the term "net," but, nevertheless, there is sufficient ambiguity presented to receive evidence relating to the intention of the Legislature.

As hereinbefore indicated, in construing the language of a statute regulating a business, it should be given the meaning as understood in the business rather than its ordinary meaning.

50 American Jurisprudence, 263, Section 277; 82 Corpus Juris Secundum, 652, 654, Sections 330, 331.

Section 1427, General Code, undertakes to regulate commercial fishing and is penal in character. Penal statutes and statutes which impose restrictions upon the conduct of business must be strictly construed and their scope can not be extended beyond the usual meaning of their terms. *Clymer v. Zane,* 128 Ohio St., 359, 191 N. E., 123, 93 A. L. R., 1245. The evidence is undisputed that in the business of commercial fishing in the Sandusky Bay area the term seine is distinguished from and is not includable within the term net.

There is uncontradicted evidence in the record that from 1911 to 1949 no effort was made by the officers in charge of the enforcement of the provisions of Section 1427 to prohibit the use of seines in the prescribed area. Lack of enforcement alone is insufficient to establish administrative interpretation of a prohibitory statute. *Louisville & Nashville Rd. Co. v. United States,* 282 U. S., 740, 75 L. Ed., 672, 51 S. Ct., 297; *Union Stock Yard & Transit Co. v. United States,* 308 U. S., 213, 84 L. Ed., 198, 60 S. Ct., 193; *Central Elevator Co. v. People, ex rel.,* 174 Ill., 203, 51 N. E., 254, 43 L. R. A., 658. Nevertheless, nonaction by administrative officers may be indicative of lack of statutory power. *In re Kansas City Star,* 346 Mo., 658, 142 S. W. (2d), 1029, 130 A. L. R., 1168; *Hennessey v. Personal Finance Co. of N. Y.,* 176 Misc., 201, 26 N. Y. Supp., (2d), 1012; *State, ex rel., v. Schaaf,* 198 Wash., 52, 86 P. (2d), 1112.

"Authority actually granted by Congress of course can not evaporate through lack of administrative exercise. But just as established practice may shed light on the extent of power conveyed by general statutory language, so the want of assertion of power by those who presumably would be alert to exercise it, is equally significant in determining whether such power was actually conferred." *Federal Trade Commission v. Bunte Brothers, Inc.,* 312 U. S., 349, 352, 85 L. Ed., 881, 61 S. Ct., 580.

Furthermore, it is well known that frequently proposed legislation is not only recommended by but is actually drafted by administrative officers prior to its introduction.

Lack of enforcement, coupled with testimony of admin-

istrative officers that in their opinion the statute was not intended to prohibit seining, affords a predicate to draw an inference supporting a finding so construing the legislative intent, especially when such administrative interpretation is long continued and the Legislature has not seen fit to change such interpretation in the passage of amendments to the statute.

Where a statute has received a contemporaneous and practical interpretation and the statute as interpreted is re-enacted, the practical interpretation is accorded greater weight than it ordinarily receives, and is regarded as presumptively the correct interpretation of the law. While the acquiescence of the Legislature seems to be of small matter where there is no evidence to the effect that the statute or contemporaneous interpretation was called to the Legislature's attention, it is believed that when action has been taken upon a statute by the Legislature, and where a practical and contemporaneous interpretation was called to its attention, the failure of the Legislature to change the interpretation should be regarded as presumptive evidence of its correctness. 2 Sutherland Statutory Construction (3 Ed.), 523, Section 5109.

But after an extended period of contemporaneous interpretation, the defendants charged with the enforcement of the act have overruled such prior construction. The basic ground for sustaining contemporaneous interpretations of long standing is the fact that reliance has been placed thereon by the public and those having an interest in the interpretation of the law. The record in the instant case discloses that the petitioners have so relied upon the former administrative interpretation. The change in interpretation merely presents a conflict in the evidence to determine the greater weight thereof for consideration by the court in arriving at a proper judicial construction of the statute. Administrative interpretation of a given law, while not conclusive, is, if long continued, to be reckoned with most seriously and is not to be disregarded and set aside unless judicial construction makes it imperative to do so. *Industrial Commission* v. *Brown,* 92 Ohio St., 309, 311, 110 N. E., 744, L. R. A., 1916 B, 1277; *State, ex rel. Automobile Machine Co.* v. *Brown, Secy. of State,* 121 Ohio St., 73, 76, 166

N. E., 903; *State, ex rel. Schweinhagen,* v. *Underhill, Clerk,* 141 Ohio St., 128, 132, 46 N. E. (2d), 861.

It is contended by the defendants that administrative interpretation should be established only by formally adopted written regulations, or premised upon opinions of the Attorney General. Most cases dealing with administrative construction arise under such formal regulations and opinions. In the instant case there is no evidence of the promulgation of any formal regulation or the rendering of any opinion by the Attorney General, but there is testimony from two former commissioners of conservation that incident to their administration of the provisions of Section 1427, General Code, they construed them as prohibiting fishing by stationary or set nets but not by the use of seines. Such testimony does not have as high a probative value or weight as a formal administrative regulation, but is admissible for consideration by the trier of the facts.

In the light of the evidence in the instant case, the finding of the Common Pleas Court is not manifestly against the weight of the evidence. Having so construed the statute upon the evidence, this court can not hold that the judgment is contrary to law.

Error is assigned to the admission of testimony over objection of a witness who testified that a conservation officer in charge of the Sandusky Bay area, since deceased, told the witness he could seine in that area and that the act did not apply to seines. This is a type of hearsay that might fall into the category of a historical fact, but the admission of what a deceased person said during his lifetime violates the fundamental basis of the hearsay rule. However, the admission of this particular item of testimony can not be found prejudicial, in the light of other competent testimony concerning the same matter.

Error is also assigned to the overruling of the demurrer to the petition on the ground that enforcement of a criminal statute will not be enjoined unless such statute is clearly unconstitutional and its enforcement would infringe upon property rights, thus causing irreparable injury for which there would be no adequate remedy at law. Although the petitions contain allegations of unconstitutionality, the basis for the com-

plaint is the enforcement of the provisions of the act against petitioners without statutory authority. The allegations are sufficient to state a cause of action for a declaratory judgment, and the demurrer was therefore properly overruled.

Error is also assigned to the granting of the injunction. In dismissing the appeal on questions of law and fact, we held that the allegations with respect to injunctive relief were superfluous and unrelated to the averments stating a cause of action for a declaratory judgment. The prayer for injunctive relief is merely incidental to obtaining a declaratory judgment and full and complete relief was afforded by the entry of the declaratory judgment.

It is, therefore, concluded that the judgment be modified by the elimination of all provisions therein for an injunction and, as so modified, the judgment is affirmed. The temporary injunction issued by this court is dissolved.

*Judgment accordingly.*

CONN and DEEDS, JJ., concur.