### IN RE TAXES, HAWAIIAN PINEAPPLE COMPANY, LIMITED.

### No. 4110.

JULY 25, 1961.

TSUKIYAMA, C. J., CASSIDY, WIRTZ, JJ., CIRCUIT JUDGE TASHIRO, ASSIGNED BY REASON OF VACANCY, AND CIRCUIT JUDGE CROCKETT, IN PLACE OF LEWIS, J., DISQUALIFIED.

168

OPINION OF THE COURT BY CASSIDY, J.

The issue on this appeal requires the determination of the general excise tax rate applicable to proceeds obtained by the taxpayer from the sale of frozen pineapple products packed by it in hermetically sealed cans.

The taxpayer has for many years operated a cannery in Honolulu in which it manufactures various products from the fruit of the pineapple. Its main product is and has always been conventionally packed pineapple, manufactured by placing raw trimmed and cut fruit, with syrup, in hermetically sealed cans and then subjecting the cans and contents to a temperature of 195 degrees for a period of time sufficient to sterilize the contents. Since 1932 the company has also manufactured single strength pineapple juice, which is processed and put up in a similar manner. These two products, like all conventionally canned fruit, vegetable, juice, or other food products, may be stored and kept indefinitely without deterioration. The taxpayer also manufactures several by-products and incidental products, including glaced pineapple, pineapple bran cattle feed, citric acid, pineapple soft drink base, and bromelain.

In 1946 the taxpayer established a division in its cannery equipped for the manufacture of frozen pineapple products and began packing three items—frozen pineapple chunks, frozen Hawaiian fruit salad, and frozen pineapple juice concentrate. These products were and are manufactured in the manner described below.

In the manufacture of frozen pineapple chunks, pieces of raw pineapple are placed in a container with a sugar-water syrup added and then subjected to a temperature of zero or less degrees for approximately an hour and a half, after which the product is stored, preliminarily to shipping, in a warehouse, at no greater than zero degree.

The frozen Hawaiian fruit salad consists of pieces of raw pineapple, papaya and banana, with a syrup made of guava puree, pineapple juice and sugar. The combination is placed in a container and subjected to the same freezing process and treatment followed in manufacturing frozen pineapple chunks.

In the manufacture of frozen pineapple juice concentrate, raw pineapple juice is heated to a temperature of between 135 to 140 degrees to deaerate the juice and evaporate some of the water from it. The temperature is reduced to 100 and finally to between 60 and 70 degrees. The flavor, removed at the first concentration stage, is added. The juice is put in containers and subjected to the same freezing process and treatment used with the other two frozen products. The heating phase involved in manufacturing frozen pineapple juice concentrate is only for the purpose of deaerating and concentrating the juice, and not to sterilize it.

Prior to 1952 each of the three frozen products was packaged in a polyethylene bag surrounded by a cardboard and cellophane overwrap. From 1952 on the frozen pineapple chunks and the Hawaiian fruit salad have been packed in hermetically sealed tin cans and the frozen pineapple juice concentrate has been put up in hermetically sealed cans or polyethylene bags.

The tax period here involved covers five fiscal years commencing June 1, 1952, and ending May 31, 1957. During that period the imposition of the tax and the rate thereof were governed by the provisions of R.L.H. 1945, § 5455 A (1) (2), as amended by S.L. 1947, Act. 111. The pertinent portions of the applicable law as so amended are quoted in the margin.[1]

---

[1] "Sec. 5455. Imposition of tax. There is hereby levied and shall be assessed and collected annually privilege taxes against the persons on account of their business and other activities in this Territory measured by the application of rates against values, gross proceeds of sales or gross income, as the case may be, as follows:

"A. Tax on manufacturers. (1) Upon every person engaging or continuing within this Territory in the business of manufacturing, compounding, *canning*, preserving, packing, milling, processing, refining or preparing for sale, profit or commercial use, either directly or through the activity of others, in whole or in part, any article or articles, substance or substances, commodity or commodities, the amount of such tax to be equal to the value of the articles, substances or commodities, manufactured, compounded, *canned*, preserved, packed, milled, processed,

It is the taxpayer's contention that its income from the sale of its frozen pineapple products packed in hermetically sealed cans was taxable under the statute at the general manufacturer's rate of one and one-half per cent. The company made its gross income tax returns and paid the general excise tax for the years involved on that basis. The tax commissioner's position is that frozen pineapple products packed in hermetically sealed cans are "canned" within the meaning of the word in the statute, and that the two and one-half per cent rate prescribed for "canneries" applied to the proceeds received by the taxpayer from the sale of such products. The commissioner made an additional assessment on that basis. The taxpayer appealed to the tax appeal court. That court, ruling in favor of the taxpayer, stated, in part, as follows:

"The evidence produced by the taxpayer shows that the terms 'canning', 'canned' and 'cannery' have uniform and definite meanings, both in the trade and in the popular sense. These terms refer to the process of preservation rather than to the container in which the products are packaged.

"The Court finds that the term 'cannery' is obviously connected with the words 'canning' and 'canned' as used in the statute as a whole. The Court finds that the meaning of 'cannery' is a place where people do 'canning'. Further, the Court finds that 'canning' means

---

refined or prepared, for sale, as shown by the gross proceeds derived from the sale thereof by the manufacturer or person compounding or preparing the same (except as hereinafter provided), multiplied by the respective rates as follows:

"Millers or processors of sugar, raw or refined, two and one-half per cent; *canneries*, two and one-half per cent; all manufacturers on whose gross income a tax is not otherwise levied in this chapter, one and one-half per cent.

"(2) The measure of the tax on manufacturers is the value of the entire product manufactured, compounded, *canned*, preserved, packed, milled, processed, refined or prepared, in this Territory, for sale, profit or commercial use, regardless of the place of sale or the fact that deliveries may be made to points outside the Territory." (Emphasis added.)

packing food in hermetically sealed containers—not necessarily tin cans—*for preservation*. Preservation requires that the product be sterilized by heat or some other process. This is the meaning of 'canning', regardless of whether the word is used in the popular sense or whether the trade meaning is given to it. The Court feels that both meanings are synonymous.

"The Court finds that in actuality, as far as pineapple is concerned, the most practical method of 'canning' is by heat treatment, though other methods might be developed. At present, sterilization by heat is the only method in commercial use.

"The Court feels that the test of whether a product is a 'canned' product or produced by the 'canning' process is whether the finished product can be taken and stored in an ordinary type room at ordinary room temperatures and be preserved for a reasonable length of time.

"The frozen products of the taxpayer, whether or not packed in tin cans, do not conform to this test. The fruit in the can, in the case of the frozen products which are placed in cans, is not *preserved*. It is still a perishable commodity which would spoil if stored at room temperature. If there is any preservation, it is done by continuously keeping the product at a low temperature. The so-called freezing plant does nothing more than do this efficiently and in such a manner that the freezing will not spoil the flavor of the product.

"The Court feels that there has been no showing at all by the Tax Commissioner that the Legislature in passing this particular statute intended to impose any higher rate on the pineapple industry than on any other industry, other than the fact that the pineapple industry is the largest canner in the Territory. The statute applies to 'canneries'—not just pineapple canneries.

"Moreover, the tax at the $2\frac{1}{2}\%$ rate is based on the value of the products 'canned'. It is not levied at the $2\frac{1}{2}\%$ rate on the value of other products produced by the pineapple industry.

"The statute speaks of manufacturing, compounding, canning, preserving, packing, milling, processing, refining or preparing for sale. 'Canning' is only one of the various categories mentioned. What is done in freezing fruits, the Court feels, is actually packing or possibly processing, but certainly not 'canning'. When the Legislature places a tax on 'canneries' it means to tax at the cannery rate the products produced by what is normally known as 'canning'—that is, products which can be stored at room temperature for a reasonably long period of time, such as a year or two years.

"It is, therefore, the opinion of this Court that the assessment is improper. Said assessment is set aside and the appeal sustained."

There is no question between the parties as to the taxable value of the frozen products made the subject of the additional assessment. The controversy exists only as to the rate applicable to the gross income received from the sale of such products. In his appeal to this court, the tax commissioner states that a single question is presented, namely: "Is the business of packing raw pineapple or raw pineapple juice into hermetically sealed tin cans without sterilizing such pineapple, or pineapple juice by the application of heat within the meaning of 'canning' as the word is used in section 5455 A, Revised Laws of Hawaii 1945?" Stated otherwise, the ultimate question for decision is: Does the process of freezing pineapple products in hermetically sealed cans constitute "canning" within the meaning of the statute?

The General Excise Tax Law (R.L.H. 1945, c. 101)

imposes a privilege tax on the gross income of all persons engaged in business, at rates dependent upon and fixed according to the particular business pursued by the individual. We are directly concerned only with the above quoted portion of subsection A of section 5455, applicable to manufacturers. In essence this subsection provides that the tax is imposed against persons engaging in manufacturing, compounding, canning, preserving, packing, milling, processing, refining, or preparing any commodity for sale, the amount of the tax to be equal to the value of the commodity as shown by the gross proceeds derived from the sale thereof, multiplied by the respective rates, as follows: "Millers or processors of sugar, raw or refined, two and one-half per cent; canneries, two and one-half per cent; all manufacturers on whose gross income a tax is not otherwise levied in this chapter, one and one-half per cent."

The word "canneries" means places where the business of canning is carried on. As a first impression, it might appear therefore that the specified two and one-half per cent cannery rate applies to all manufacturing done in a cannery, whether the products manufactured are "canned" or not. However, a construction producing that result would be wholly at variance with the over-all purpose and patent general intent of the excise tax law to impose the tax in all cases on the income earner according to the nature of his particular business, and not on the basis of the place where it is conducted. Such intent undoubtedly might have been more exactly expressed in fixing the rate for canning by the use of the term "canners" in place of "canneries," comparably to and consistently with the designation "millers or processors" in the preceding clause fixing the rate for sugar production. Notwithstanding this possible inexactness of terminology, we think it clear from a consideration of the framework and scheme of the entire

statute that the particular provisions under consideration must be construed to mean products manufactured in a plant which may be designated a "cannery" are not subject to the two and one-half per cent cannery rate unless they are "canned." This construction is conceded by the tax commissioner. That it has been followed in the administration of the gross income tax law since it was enacted in 1935 is evidenced by the fact the income this taxpayer has received from the sale of its side products (pineapple bran, citric acid, bromelain, etc.) and also, prior to 1952, from the sale of all of its frozen products, has never been assessed at the higher specific cannery rate but has always been taxed at the lower rate generally applicable to manufacturers.

In our opinion, therefore, the taxpayer's frozen products packed in hermetically sealed cans were subject to the one and one-half per cent general manufacturer's rate unless such products may properly be classed as "canned," or, what is the same thing, may be considered to have been produced by "canning."

One of appellee's principal contentions is that, in construing the statute, the key words "canning" and "canned" should be accorded the meaning attached to them in the canning trade or industry. On the trial before the tax appeal court the taxpayer introduced testimony of several witnesses, given directly or by deposition, respecting the trade meaning of such terms. Each witness was qualified through many years of experience in some field connected with the food industry. The substance of their evidence is summarized hereunder.

Within the food producing and food marketing trades, a "canned" commodity is uniformly and definitely taken to be one which has been packed in a hermetically sealed container and sterilized by the use of heat. Other methods of sterilization are possible, but at present the heat process

is the only one used in commercial canning. The heat treatment kills all the bacteria in the commodity and hermetically sealing the container is necessary to prevent reinfection. Food that has been canned may be stored indefinitely at ordinary temperatures without spoilage. Sterilization is an indispensable requisite of canning. In freeze packing of food there is no sterilization. The freezing process does not kill bacteria. It merely inactivates them. Whether the frozen food is packed in a hermetically sealed container or not, the bacteria in the product remain dormant only as long as the contents of the container are kept frozen. Maintenance at zero temperature or below is essential to preservation of a frozen food product. The type of container used is a matter of convenience and not a material element in the production of frozen foods.

The evidence introduced by the taxpayer clearly established that in the canning industry and allied food trades, at all levels from the processor through the broker or wholesaler to the retailer, taxpayer's frozen products upon which the additional assessment was made in this case would not be classified or spoken of as "canned." The tax commissioner offered no testimony in opposition to this evidence. He, in fact, concedes that, within the industry, none of taxpayer's frozen products would be deemed "canned" and the process of producing them would not be considered "canning." As stated in his opening brief, "The Tax Commissioner admits that 'canning' has a definite and uniform trade meaning. In the trade sense it refers to the process of packing food into a hermetically sealed container and sterilizing the product by the application of heat."

Referring to and quoting from 2 Sutherland, *Statutory Construction* (3d ed.), § 4919, p. 442, appellant also admits awareness of the principle of statutory construction that "in the absence of a legislative intent to the

contrary, commercial terms when used in a statute relating to trade or commerce are presumed to have been used in their trade or commercial meaning." However, he urges that the presumption is not applicable or operative in this case for reasons given as follows:

"In the first place, the statute (section 5455) does not relate to trade or commerce but to taxation. And as to the interpretation of tax statutes the same text says: 'Conspicuously important to the interpretation of tax measures is the rule that words are to be given their common and ordinary meaning.' 3 Sutherland, *Statutory Construction*, p. 313 (3d edition). Secondly, the presumption is applicable only in the absence of legislative intent to the contrary."

In construing or interpreting any statute, the one and only quest is to ascertain the intent of the legislature. To that end the words of a statute normally are to be taken in their popular sense. And this approach is applicable to a tax statute, even though, as indicated hereunder, tax statutes are susceptible to the rule of strict construction. "In the first place, the words of statutes—including revenue acts—should be interpreted where possible in their ordinary, everyday senses." *Crane* v. *Commissioner,* 331 U.S., 1, 6. Also, *In re Taxes, Johnson,* 44 Haw. 519, 530, 356 P. 2d 1028, 1034; *Advertiser Pub. Co.* v. *Tax Com'r Fase,* 43 Haw. 154, 160; *Hawaii Cons. Ry.* v. *Borthwick,* 34 Haw. 269, 272; *Helvering* v. *San Joaquin Co.,* 297 U.S. 496, 499.

Attributing the common meaning to words of a statute is the general rule. The rule presuming the trade meaning of words in a statute involving or directed at a particular trade is the exception. But if the presumption is applicable and prevails, then the words of the statute are to be taken according to their trade meaning, even though such

meaning is at variance with the common or ordinary meaning of the words.

In *O'Hara* v. *Luckenbach S.S. Co.*, 269 U.S. 364, the effect of the trade meaning rule is stated at p. 370, as follows: "In this conclusion we are fortified by the consideration that the legislation deals with seamen and the merchant marine and, consequently, the phrase 'divided into . . . watches' is to be given the meaning which it had acquired in the language and usages of the trade to which the Act relates, in accordance with the rule stated in *Unwin* v. *Hanson*, [1891] L. R. 2 Q. B. 115, 119: 'If the Act is one passed with reference to a particular trade, business, or transaction, and words are used which everybody conversant with that trade, business, or transaction, knows and understands to have a particular meaning in it, then the words are to be construed as having that particular meaning, though it may differ from the common or ordinary meaning of the words.' "

Also illustrative is *Wadsworth* v. *Dambach*, 99 Ohio App. 269, 133 N.E. 2d 158, in which at p. 161 it is stated: "Does the phrase 'any net whatever' as employed in Section 1427, General Code, include a 'seine?' The word 'whatever' neither adds nor detracts from 'any net' and has been deleted in the Revised Code. According to the dictionary, a seine is a large net of a particular type. In general, words of a statute in common use will be construed in their ordinary acceptation and significance and with the meaning commonly attributed to them. *Baker* v. *Powhatan Mining Co.*, 146 Ohio St. 600, 67 N.E. 2d 714; *State ex rel. Church of the Nazarene* v. *Fogo*, 150 Ohio St. 45, 79 N.E. 2d 546. Application of this principle would exclude any further interpretation of the statute. But the question as to the meaning of a term used in a statute is not necessarily what that term means in general use, but what it means in the particular statute in

which it is found. * * * There is a further principle that in construing the language of a statute regulating a business it should be given the meaning as understood in the business rather than its ordinary meaning." See also 50 Am. Jur., *Statutes,* § 277, p. 263; 82 C.J.S., *Statutes,* § 330, p. 652.

In order to invoke the presumption in any case, it is necessary that the trade meaning of the term under consideration be adequately proven. "What is the result when there is a term with a common meaning and also an alleged commercial or trade meaning? In the absence of a legislative intent to the contrary, the common meaning will prevail until the commercial or trade meaning is proved. The trade or commercial meaning of a term is a fact to be proved in each case. Until such fact is proved, an alleged commercial or trade meaning of a common term is presumed to be the same as the common meaning." 2 Sutherland, *Statutory Construction* (3d ed.), § 4919, p. 443. See also 31 C.J.S., *Evidence,* § 67, p. 649.

Since the uncontradicted proof in this case is that the trade meaning of "canning" and "canned" excludes frozen foods, however packed, such trade meaning of the words should be adopted in construing § 5455 A unless there is some positive reason why the presumption should not be applicable or effective.

As we have noted, the first point made by appellant in opposition is that the presumption is not applicable because the statute under consideration "does not relate to trade or commerce but to taxation." There is no rational basis for the contended distinction. The rule of construction under consideration is one of general applicability. While it is a taxing statute that we are dealing with, the provisions of the statute requiring interpretation or construction relate to and are directed at a particular industry—canning. The rule is therefore pertinent. This

readily appears by extending appellant's quotation from 3 Sutherland, *Statutory Construction* (3d ed.), § 6710, p. 313, as follows: "Conspicuously important to the interpretation of tax measures is the rule that words are to be given their common and ordinary meaning. But tax laws often extend to technical fields, in which cases reference to scientific facts, the commercial background of the statute, *trade meaning* and *commercial usage* and sound accounting principles become imperative." (Emphasis added.) Case authority fully bears out the text.

In *Arthur* v. *Butterfield,* 125 U.S. 70, at p. 75, the court states: "It is well settled that a designation of an article of commerce by merchants and importers, when clearly established, determines the construction of a revenue law when that article is mentioned."

In *Robertson* v. *Salomon,* 130 U.S. 412, at p. 415, it is said: "The commercial designation, as we have frequently decided, is the first and most important designation to be ascertained in settling the meaning and application of the tariff laws."

An appropriate example of the application and effect of the presumption in a tax case is presented by *Carter* v. *Liquid Carbonic Pacific Corporation,* 9 Cir., 97 F. 2d 1, in which the court construed a statute imposing an excise tax on "carbonic acid gas sold by the manufacturer * * * to a manufacturer of any carbonated beverages * * * and upon all carbonic acid gas used * * * in the preparation of soft drinks." The issue was whether the tax applied to carbonic acid gas sold to a brewer which used it in the manufacture of near (3.2) beer in substantially the same proportions used in the manufacture of other drinks popularly classified as carbonated beverages. The court found that, under dictionary definitions of "carbonated," near beer was within the general meaning of the words "carbonated beverage" but in view of the uncontroverted

testimony that the trade meaning of the words excluded near beer from that classification, held that the tax was not applicable, stating at p. 3:

"At the trial the appellee produced five witnesses, all of whom were qualified as experienced either in the manufacture of beer or of soft drinks. These witnesses testified that the word 'beer' has a definite meaning in the beverage trade as does the term 'carbonated beverages'; that the term 'carbonated beverages' in trade usage does not include 'beer.' No evidence contradictory to that just summarized was introduced.

"Since we are dealing with a tax which is directed at a particular industry, this definite proof of a trade usage as to the term 'carbonated beverages' calls into application the familiar rule that commercial and trade terms having a uniform and definite meaning in commerce and trade will be interpreted accordingly. * * *.

"This rule does not become inapplicable because the term in question has a general meaning, as understood by society at large as well as a special trade significance."

See also, *e.g., Philadelphia Storage Battery Co.* v. *Lederer,* D.C. Pa., 21 F. 2d 320; *Craig* v. *Southern Bell Tel. & Tel. Co.,* 208 Miss. 881, 45 So. 2d 732; *State* v. *Vogl,* 149 Me. 99, 99 A. 2d 66; *Cadwalader* v. *Zeh,* 151 U.S. 171; *White* v. *Aronson,* 302 U.S. 16.

The authorities referred to clearly establish that the presumption according trade meaning to words of a statute referring to a particular trade applies as much to a tax statute as to any other kind of statute. The presumption, however, is not conclusive. The rule permitting the use of the presumption is in all cases subordinate to the cardinal principle that, the legislative

intent, however evinced, must be given effect. If other cognizable factors indicate a legislative intent repugnant to or inconsistent with giving the trade meaning to words of a statute, the presumption cannot prevail. See *e.g., United States* v. *Stone & Downer Co.,* 274 U.S. 225; *Hahn* v. *United States,* D.C. N.Y., 131 Fed. 1000.

Appellant contends that the context of the General Excise Tax Law shows that the popular, and not the trade meaning, of the words under consideration was intended. It is stated that the original act (S.L. 1935, Act 141) was carefully drafted and that, where a special meaning of a word was intended, the meaning was clearly spelled out in the act. Reference is made to § 1 of the act, which defines "commissioner," "person," "company," "tax year," and thirteen other terms used in the act. It is argued: "This shows that if the legislature intended cannery to have other than its ordinary and popular meaning it would have spelled out such other meaning. If a trade meaning of cannery were intended by the legislature, it would have said so as it did in subsection 10 of section 1 of Act 141, which became section 5446 of the Revised Laws of Hawaii 1945 (Sec. 117-5, Revised Laws of Hawaii 1955), and in which it defined wholesaler or jobber as applying 'only to a person doing a regularly organized wholesale or jobbing business, known to the trade as such.' "

We think the argument nebulous. The failure of the legislature to spell out a specific meaning for "canning" or its related terms is what permits indulgence in the presumption that the trade meaning was intended. We are also unable to give any particular significance to the fact that in one instance, that of defining wholesaler and jobber, the law provides the words are to be taken as known in the trade. It would be extremely speculative to infer and we are unwilling to conclude that the legis-

lature thereby intended to abrogate, insofar as the whole act was concerned, the rule of construction under consideration. By S.L. 1957, Act 34, the legislature deleted the phrase "known to the trade as such" in defining wholesaler and jobber. The reason for the deletion is not revealed in the committee reports but it seems as reasonable a conjecture as any to surmise that the action was taken to eliminate redundancy and surplusage and with recognition that the terms wholesaler or jobber would be read with reference to trade meaning without such language.

The tax commissioner's further argument is: "That the legislature intended to impose the $2\frac{1}{2}\%$ rate on pineapple products is expressed in Stand. Com. Rep. No. 85, 1935 Senate Journal 422-423." This point is predicated on the inclusion in the report of the statement: "This bill is the much publicized Gross Income Tax Bill, which proposes to levy a tax of $2\frac{1}{4}\%$ in a general way against those coming under the definition of 'Retailers,' and $\frac{1}{4}$ to $1\%$ against those defined as 'Wholesalers,' at the same time levying the higher rate against sugar and pineapples immediately before such products enter into interstate or foreign commerce. It is described as a privilege tax,— a tax for the privilege of doing business in the Territory of Hawaii. This is the backbone of the administration's tax program." We think this argument of appellant also rests on a speculative and unsubstantial basis.

Since the pineapple industry is one of Hawaii's leading industries and the amount of canning done in the industry is immeasurably greater than that done by other canners in Hawaii, the statement quoted from the report may be taken as reflecting the legislature's intention of requiring the pineapple industry to contribute substantially to the support of the new tax program, but we find nothing in the quoted statement, or elsewhere in the

report, which sheds any light on the question of which particular types of pineapple products are included by the term "canned," so as to subject them to the higher cannery rate. The provisions of § 5455 A levying the higher rate on canneries are not limited to the pineapple industry. During the period involved in this case the higher rate applied to all canneries.[2] If it had been the intent of the legislature to tax all pineapple products at the higher rate, as contended by appellant, it would not be unreasonable to expect to find that intent manifested by more specific language than is expressed by the terms "canning," "canned," and "canneries." Further, the record reveals that, in the administration of the tax, the higher cannery rate has not been applied to all pineapple products. All of the taxpayer's side products, such as pineapple bran cattle feed, citric acid, bromelain, etc., have been taxed at the lower general manufacturer's rate. The same is true in respect to all of the frozen pineapple products manufactured by the taxpaper prior to 1952 and, since then, of its frozen pineapple juice concentrate put up in polyethylene bags.

As has been noted, the presumption attributing the trade meaning to words in a statute directed at or relating to a particular trade or industry is applicable in the absence of satisfactory evidence of legislative intent to the contrary. Since we do not agree with appellant's contention that in this case there is evidence to that effect, it follows that the presumption should be given effect and that, therefore, the taxpayer's frozen products, though packed in hermetically sealed cans, cannot be considered "canned" within the meaning of that term as used in § 5455 A. Furthermore, we are of the opinion that the

2 By Act 1, Sp. S.L. 1957, the words "pineapple canneries (including canning of pineapple juice)" were substituted for the word "canneries" in the statute.

same result is reached in a construction of the statute made without resort to or consideration of the rule invoking the presumption.

Basic to appellant's case is the contention that, as the "ordinary and popular meaning of 'canning' does not require sterilization of the product 'canned' by heat or by any other process," "canning" does include the process followed by the taxpayer in manufacturing its frozen products. In support of the premise underlying the contention, appellant relies on definitions found in the three dictionaries referred to hereunder.

The Oxford English Dictionary (1933) defines "canning" as:

"The preserving of meat, fish, fruit, etc., by sealing up in cans or tins; tinning."

From Webster's New International Dictionary (2d ed.) 1934, are the following:

"can (kan), v.t.; CANNED (kand); CANNING. 1. To put in a can or cans; to preserve by putting in sealed cans or jars.

"canned (kand), adj. 1. Preserved in cans, as *canned goods.* * * *

"canning (kan'ing), n. The process or business of sealing food in cans or jars, esp. for commercial distribution."

In connection with the reference to Webster's Dictionary, appellant states: "Clearly the taxpayer's activity of putting pieces of pineapple, concentrated pineapple juice, or pieces of pineapple, papaya and banana into tin cans, and sealing such cans hermetically is within the ordinary meaning of 'canning' and that such products are within the ordinary meaning of 'canned.' There is no question that this activity is carried on for commercial distribution. There is nothing in the above definition which confines 'canning' to the process of preserving food

which is sterilized by cooking."

The third reference is to Funk & Wagnalls' New Standard Dictionary (1956) which defines "canning" as:

"The act, process, or business of preserving fruits, vegetables, or meats, by partial cooking or other process, and hermetically sealing in tin cans, glass jars, etc."

From the foregoing it is argued: "This common, popular and ordinary meaning of canning found in Funk & Wagnall is not restricted to preservation by sterilization through cooking; it includes any 'other process'. The other process involved here is the freezing, the removal of heat, done by the taxpaper."

We do not derive from the dictionary definitions the certainty of meaning of the words "canned" and "canning" appellant imputes to them. We think appellant's argument ignores, or, at least, unduly minimizes the part "preservation" plays in the definitions. Quite implicit in the definitions, as we read and understand them, is the conception that, in order for a product to be "canned," it is essential that after the canning process has been completed, and by reason of the nature of the process itself, the product must be in a state of permanent preservation, *i. e.,* that it be rendered immune to spoilage or, in other words, that it be sterilized. As we have noted, in the freezing process there is no sterilization—decomposition is merely arrested. It would seem reasonable to say, therefore, that the freezing process does not preserve the product. Apt is the holding of *United States* v. *Conkey & Co.,* 12 Ct. Cus. App. 552, reflected in a headnote reading: "It is the common acceptance of the word *'preserved,'* when applied to meat, that it has been so processed that its preservation is of permanent character. This court, and other courts, have frequently held that articles of importation, referred to in the tariff statutes as preserved,

have had something more done to them to preserve them than merely to arrest change and decomposition while in transit. So frozen meat is not 'preserved' within the meaning of that term in paragraph 706, tariff act of 1922."

That permanent preservation by sterilization is an essential element of the canning process is indicated by the excerpts from several standard encyclopedias quoted below.

" 'Canning, Commercial.—a method of preserving food by placing it in a hermetically sealed container and sterilizing it by heat.' Collier's Encyclopedia (1953), Vol. 4, p. 468."

" 'Canning, Commercial. * * * Heat Sterilization or Thermal Processing. This is one of the most important operations in the canning procedure and essentially consists of subjecting the food — usually contained in the sealed can—to a known temperature for a period of time adequate to destroy spoilage and pathogenic organisms which might be present on the raw food material.' Encyclopedia Brittanica (1955), Vol. 4, p. 748 ff."

" 'Canning—Most of the food we preserve is packed into airtight containers of tin or glass. The two chief principles of canning are cooking the food to destroy the microorganisms and enzymes that cause spoilage, and keeping air out of food so that no more microorganisms can form and grow.' World Book Encyclopedia (1954), Vol. 6, p. 2667 ff."

" 'Canning industry: In canning, the food is first sterilized by heating—that is, the bacteria which cause fermentation and decay are killed in this manner; and the cans or jars are hermetically sealed to prevent fresh bacteria from entering.' Compton's Pictured Encyclopedia (1929), Vol. 2, p. 631."

It is apparent from the excerpts quoted that a process

of food preservation is not considered "canning" unless the food is sterilized in the process. In that respect, the encyclopedias fully support the tax appeal court's conclusion that the ordinary meaning and the trade meaning of "canning" are the same and that neither includes the packing of nonsterile frozen food in a hermetically sealed can.

Appellant submits, however, that we should ignore the encyclopedias, contending: "The answer to this [use of the encyclopedias] is that to determine ordinary meaning of words people go to common dictionaries and not to encyclopedias."

While it is undoubtedly true that the usual practice in determining the meaning of words is to consult dictionaries only and that such resort is ordinarily sufficient for the purpose, we perceive no sound reason why it is not permissible to supplement dictionary definitions by taking into account the information presented by encyclopedias, particularly where the words under consideration pertain, as we think they do here, to a technical or semi-technical subject in respect to which the dictionary definitions do not appear to be precise or inclusive. See *People* v. *French Bottling Works,* 259 N.Y. 4, 180 N.E. 537; *In re Siemens Estate,* 346 Pa. 610, 613, 31 A. 2d 280, 282; *Palmer* v. *Sun Oil Co.,* D.C. Ohio, 78 F. Supp. 38, 53; *Werk* v. *Parker,* 249 U.S. 130, 132; 31 C.J.S., *Evidence,* § 12, p. 517. But, be that as it may, it avails appellant nothing to have us ignore the encyclopedias, since, if we confine our consideration to the dictionaries for the meaning of "canning" and its related terms, we can only conclude that appellee's contention that its frozen pineapple products are not "canned" is, to say the least, just as reasonable as appellant's contrary contention. Without resort to the encyclopedias, we are placed in a position where it is necessary to make a choice of mean-

ings and, since we are dealing with a tax statute, the choice is influenced by the rule that "if doubt exists as to the construction of a taxing statute, the doubt should be resolved in favor of the taxpayer." *Haw'n Trust Co.* v. *Borthwick,* 35 Haw. 429, 436.

A clear pronouncement of the rule is given in *Frear* v. *Wilder,* 25 Haw. 603 at 606, as follows: "It is a cardinal rule of construction that a statute imposing taxes is to be construed strictly against the government and in favor of the taxpayers and that no person and no property is to be included within its scope unless placed there by clear language of the statute. (Sutherland Statutory Construction p. 462; Black's Federal Income Taxes, Sec. 27.) 'In the interpretation of statutes levying taxes it is the established rule not to extend their provisions, by implication, beyond the clear import of the language used, or to enlarge their operations so as to embrace matters not specifically pointed out. In case of doubt they are construed most strongly against the government and in favor of the citizen.' *Gould* v. *Gould,* 245 U.S. 151."

This court has on many other occasions resolved an ambiguity in a statute imposing a tax in favor of the taxpayer. See *Minister of Finance* v. *Bishop & Co.,* 3 Haw. 793, 794; *Castle & Cooke* v. *Luce,* 5 Haw. 321, 324; *Valkenberg* v. *Treasurer,* 14 Haw. 182, 183; *Assessor* v. *C. Brewer & Co.,* 15 Haw. 29, 38; *Seattle B. & M. Co.* v. *Treasurer,* 18 Haw. 117, 120; *Apokaa Sugar Co.* v. *Wilder,* 21 Haw. 571, 576.

This court has also often applied strict construction against a taxpayer and in favor of the government when the ambiguity pertained to an exemption in a taxing statute. See *Bishop* v. *Gulick,* 7 Haw. 627, 630; *O. R. & L. Co.* v. *Shaw,* 12 Haw. 76, 77; *Tax Assessor* v. *Wood,* 18 Haw. 485; *In re Taxes, Pineapple Companies,* 19 Haw. 193, 195; *In re Taxes, Henry A. White,* 33 Haw. 214, 218.

*Re Excise Tax Rob't Hind, Ltd.,* 34 Haw. 40, 42; *In re Yerian,* 35 Haw. 855, 875; *In re Perry Tax Appeal,* 36 Haw. 340, 346; *In re Taxes, Johnson, supra,* at 538.

*Haw'n Trust Co.* v. *Borthwick, supra,* points out, with a thorough review of authorities, that, in fields other than taxation, this court has frequently adopted either liberal or strict construction of an ambiguously worded statute according to the particular class of statute involved.

We have extended the review of our own authorities because we are cited *Advertiser Pub. Co.* v. *Tax Com'r Fase,* 43 Haw. 154, in which, without reference to any of them, it is stated at p. 162:

"As to the contention that tax laws must be strictly construed, the statement by Judge Cooley in Crawford's *Statutory Construction* seems to be particularly appropriate to the construction of tax laws.

" 'If the rule of strict construction can be effectively criticized, the same is equally true with the rule of liberal construction. In fact, Judge Cooley has done so.

" ' "There must surely be a just and safe medium between a view of the revenue laws which treats them as harsh enactments to be circumvented and defeated if possible, and a view under which they acquire an expansive quality in the hands of the court, and may be made to reach out and bring within their grasp, and under the discipline of their severe provisions, subjects and cases which it is only conjectured may have been within their intent. Revenue laws are not to be construed from the standpoint of the taxpayer alone, nor of the government alone. Construction is not to assume either that the taxpayer, who raises the question of his legal liability under the laws, is necessarily seeking to avoid a duty to the state which protects

him, nor, on the other hand, that the government, in demanding its dues, is a tyrant which, while too powerful to be resisted, may justifiably be obstructed and defeated by any subtle device or ingenious sophism whatsoever. There is no legal presumption either that the citizen will, if possible, evade his duties, or, on the other hand, that the government will exact unjustly or beyond its needs. All construction, therefore, which assumes either the one or the other, is likely to be mischievous and to take one-sided views, not only of the laws, but of personal and official conduct." ' (Crawford, *Statutory Construction, Strict and Liberal Construction,* § 259, p. 511.)"

We are unable to reconcile the implications of Judge Cooley's exposition as applied to strict construction of tax statutes with established law on the point. The expression of the eminent author's opinion was unsupported by judicial authority. It was made at a time (1876) when there were not many precedents available.[3] It is not easily equated with our own precedents. That it now finds judicial support in few jurisdictions appears from the general discussion of the rule in the Crawford text from which the quotation was taken.

"As a general rule, and in accord with the prevailing view, revenue laws, and particularly tax laws, should be construed in favor of the taxpayer and against the government. In fact, they are to be construed liberally in favor of the taxpayer, and any sub-

[3] In the preface to the second edition of Judge Cooley's work, published in 1886, the author states: "In the original edition pains were taken to present in as clear a light as possible the fundamental principles underlying the law of taxation. This involved the necessity for expressions of opinion on some points not yet covered by authoritative decision; but the author is happy to believe that on no important point have the subsequent decisions shown him to be in error."

stantial doubt resolved in favor of the citizen. Hence, any tax proceedings must be in strict accord with the provisions of the statutes relating thereto.

"This view rests, so it would seem, upon the principle that a tax cannot be imposed without the use of clear and express language. * * * Accordingly, in case of doubt or of ambiguity, that construction should be adopted which opposes the imposition of the tax. And, obviously, this strict rule of construction is especially applicable to statutes which impose a privilege tax, or a tax on an occupation, or impose penalties or forfeitures or deprive the taxpayers of his property by summary proceedings.

* * * * *

"Although this rule of strict construction generally seems to be a desirable one, yet there appears to be a tendency in some states to depart from it and to subject tax laws to a 'reasonable' construction. But regardless of the rule to be used, the tax statute should not be extended by construction beyond the clear meaning of its language, to include either persons or property not expressly embraced." (Crawford, *Statutory Construction,* § 257, pp. 502-505.)

We see no reason to deprecate the rule of strict construction as applied in tax cases. Whether favoring the taxpayer on provisions imposing the tax or cutting against him on exemptions, it is a practical rule and, when properly applied, resolves by a fixed standard ambiguities that otherwise would rest for determination on pure guess or on the court's notions of the policy of the law. Therefore, to countermand anything in *Advertiser Pub. Co.* v. *Tax Com'r Fase* that may appear to be or might be taken as a departure from or modification of the rule of strict construction laid down in the prior decisions of this court, we repeat and reaffirm the statement of the court in *Haw'n*

*Trust Co.* v. *Borthwick, supra,* at p. 437, as follows: "The comparatively recent case of Hassett v. Welch above cited, again reaffirming Gould v. Gould—the basis of this court's ruling in Frear v. Wilder—puts it beyond question that, as said above, one of the 'settled rules of statutory construction' is that, 'if doubt exists as to the construction of a taxing statute, the doubt should be resolved in favor of the taxpayer * * *.' "

It is not to be inferred from the foregoing that the rule of strict construction is being given a preferred status. It is fully recognized that the rule is not a substitute for other rules of construction (*Citizens' Bank* v. *Parker,* 192 U.S. 73, 85) and that, like all rules of construction, it is subordinate to the first principle that "the pole star of interpretation of statutes, whether it be of tariff acts or any other, must be the intention of Congress, when that can be clearly ascertained and is reasonably borne out by the language used." *United States* v. *Stone & Downer Co., supra,* at 252. It is only if after consideration of the other possible aids of construction the intent of the legislature still cannot be clearly ascertained from the language used in a taxing statute, that the rule of strict construction comes into play to resolve the ambiguity. That, we believe to be the situation here.

As has been stated, we do not find anything in the context of the law or in the cited committee report on its adoption which furnishes any satisfactory clue to legislative intent respecting the meaning or coverage of the words under consideration. There appear to be no other indicia in that respect. We must look to the words themselves for their meaning and for the answer to the issue in this case. Therefore, since we are satisfied that "canning" may as reasonably, if not more reasonably, be taken to exclude as to include the process of freezing food products in hermetically sealed cans, in accordance with the

foregoing rule of strict construction, we are required to hold, even without consideration of the rule respecting trade meaning, that the taxpayer's frozen pineapple products are not "canned" within the purview of § 5455 A.

Although we do not consider the case to be on all fours as contended by appellee and do appreciate the existence of distinguishing features pointed out by appellant, we nevertheless find considerable support in *McDowall Transport v. United States,* S. D. Fla., 130 F. Supp. 681, for our holding in this case, particularly on the point that "canned" may be reasonably defined not to include frozen food products packed in hermetically sealed cans.

In the cited case, McDowall Transport held a certificate of convenience issued by the Interstate Commerce Commission authorizing it to transport "canned food and canned fruit juices, in containers." The issue was whether the certificate permitted the carrier to transport frozen fruit and frozen juice concentrate processed and packed in hermetically sealed cans in the same manner the taxpayer's frozen pineapple products have been processed and packed since 1952. The court held the Commission's ruling that the term "canned" did not include frozen fruit products in hermetically sealed cans was not arbitrary or capricious, stating at p. 685:

"The decisions of the Commission commencing with the 1918 case of Eastbound Transcontinental Canned Goods (No. 2), supra, interpreting the term 'canned' as used in rate matters and in motor carrier certificates, are uniform and consistent. McDowall has cited no holding of the Commission to the contrary. Without variance, the Commission decisions respecting the meaning of 'canned' or 'canned goods' follow the same principle. That principle (the identical one invoked in the complained-of order) is that the word 'canned' refers not to the type of container, but to the method

of preservation. The decision reached is consistent with all of the Commission's earlier decisions and falls into place with them as a reasonable interpretation by the Commission of the certificate issued by it."

See also *Donnely* v. *Mavar Shrimp & Oyster Co.*, 5 Cir., 190 F. 2d 409; *Paramount Citrus Assn.* v. *Jacobsen*, 162 Cal. App. (2d) 147, 328 P. 2d 14.

Consistently with the foregoing, we hold that the proceeds received by the taxpayer from the sale of frozen pineapple products during the five years involved in this case were taxable under § 5455 A at one and one-half per cent. The ruling of the tax appeal court is therefore affirmed.

*Shiro Kashiwa,* Attorney General, and *Nobuki Kamida,* Deputy Attorney General, for appellant.

*Marshall M. Goodsill (Anderson, Wrenn & Jenks* of counsel), for appellee.

DISSENTING OPINION OF CIRCUIT JUDGE CROCKETT.

Where a question of statutory construction arises this court has uniformly held that words of a statute should be taken in their usual sense unless there is sufficient to indicate that they were intended to be taken in some other sense. In *Hawaii Cons. Ry.* v. *Borthwick,* 34 Haw. 269, this court reviewed the several decisions and summarized them at p. 272 as follows:

"It is a generally accepted rule of statutory construction that *unless* it *appears* by the *context* or *otherwise in the statute* a different sense was intended, words are to be given their ordinarily accepted meaning. As said previously by this court, its 'plain and obvious meaning,' *Kauai* v. *McGonagle,* 33 Haw. 915; in its 'usual sense,' *Yoshizawa* v. *Hewitt,* 31 Haw. 625; 'in its known and ordinary significance,' *Hollinger* v. *Kumalae,* 25 Haw. 669, 686; in its 'commonly accepted

meaning,' *Estate of Castle,* 25 Haw. 108, 118; in its 'usual sense,' *Ottmann* v. *Young,* 12 Haw. 303, 306; *Thomas* v. *Norton, supra."* (Emphasis added.)

Also in *Hollinger* v. *Kumalae,* 25 Haw. 669, 686, it was said: "Unless, therefore, there is *something in the context* showing that Congress intended a different meaning we must hold that it intended the words used to be accepted in their known and ordinary significance. By the context is meant not only. the sentence or section in which the words occur but the whole body of the act." (Emphasis added.)

I am unable to concur with the conclusion reached by the majority for the reason that I can find nothing in the context of the statute in question to indicate that the words of the statute should be taken in some other than their usual sense.

The statute in question is a general tax statute, not applicable to a particular trade or business and there is nothing in the statute or, as set out in the majority opinion, nothing in the committee reports to indicate that the legislature was aware of the fact that the words in question had a "trade-meaning" distinct from their ordinary and usual meaning. The fact that there is such a distinction has only been developed when experts in a particular trade or industry have been called to testify. To now give these words their "trade-meaning" is in my opinion judicial legislation and not judicial interpretation. It is not an ascertainment of the legislative intent.

Since this is primarily a question which depends upon a determination of legislative intent, I am in further disagreement with the majority in applying to these words their "trade-meaning" for the reason that the "trade-meaning" in itself is arbitrary and incomplete. It includes as "canning" only those products which are canned by being "sterilized by heat" and "hermetically sealed." It has been

pointed out by eminent authorities that there are at least five or more other processes of sterilization which to some extent accomplish the same purpose; that these products are likewise hermetically sealed in cans or similar containers and distributed to be consumed. It is also a matter of common knowledge that many products are sold and distributed in sealed cans or containers which apparently are not or do not require sterilization by heat or any sterilization process. A few examples are beers, soda-water, fruit juices, coffee, tea, peanuts, macadamia nuts and candies. Under the construction of the statute adopted by the majority these articles which now appear on the shelves of our supermarkets in cans are not "canned."

This is a general tax law, not confined to any one particular trade or industry, I therefore do not agree that the rule that a trade-definition should be adopted in preference to the common or dictionary meaning of the words in question.